2021 Jun-28 PM 01:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| **MARY JANE SMITH,** | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | 4:19-cv-01371-ACA |
| | ] | |
| **BIG LOTS STORES, INC.,** | ] | |
| | ] | |
| Defendant. | ] | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Big Lots Stores, Inc.'s ("Big Lots") motion for summary judgment. (Doc. 25).

Plaintiff Mary Jane Smith alleges that when she was 67 years old, Big Lots closed the store where she worked and declined to transfer her to a nearby newly-opening store, instead filling the new store's position with two younger employees, in violation of the Age Discrimination in Employment Act of 1967("ADEA"), 29 U.S.C. § 621 *et seq.* Big Lots moves for summary judgment on the grounds that Ms. Smith voluntarily resigned, her replacement was not substantially younger than her, and she cannot establish that its reason for declining to transfer her was pretextual. Because Ms. Smith has presented evidence creating a genuine dispute of material fact about each of those issues, the court **DENIES** the motion for summary judgment.

## I. BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). The court describes the facts in that light, accepting all evidentiary disputes in Ms. Smith's favor.

Each Big Lots store has a "team lead" (Big Lots' term for a store manager) and two "assistant team leads" (Big Lots' term for an assistant manager). (Doc. 26-1 at 20, 22–23). The assistant team leads share overlapping duties but also have individual responsibilities for either service or merchandise. (*Id.* at 23). In 2001, Ms. Smith began working as an assistant team lead over service at a Big Lots store located in Gadsden, Alabama. (Doc. 27 at 12–13; Doc. 34-1 at 2 ¶ 4). She worked in that position until 2018, when she was 67 years old and earning the equivalent of $17.40 per hour. (*See* Doc. 26-1 at 22–23; Doc. 27 at 5; Doc. 27-11). At that time, the store's team lead was James Jackson (doc. 26-1 at 20), and its assistant team lead for merchandise was Olivia Mathews (doc. 26-1 at 22–23), who was 27 years old (*see* doc. 27-23 at 5).

In late 2017, Darren Smith, Big Lots' "district team lead" (the company's term for a district manager) learned that Big Lots was going to close the Gadsden store and open a "Store of the Future" in Rainbow City, Alabama. (Doc. 26-1 at 12, 14,

17). Big Lots has a policy that, when it permanently closes a store for economic or business reasons, it will attempt to find positions at other locations for associates in good standing. (Doc. 26-5 at 21). The policy also provides that Big Lots offers "store closing pay" to associates whose employment is terminated because of a permanent store closing if they remain with the store until released. (*Id.*). But "an associate who turns down a transfer opportunity for a comparable position within thirty (30) miles will not be eligible for store closing pay." (*Id.*).

In December 2017, Mr. Smith spoke with John Soria, a 57-year old assistant team lead over merchandise at a Big Lots store located in Guntersville, Alabama, about the plan to close the Gadsden store and open a Store of the Future in Rainbow City. (Doc. 27-25 at 6–7, 11). Mr. Smith asked Mr. Soria if he would be interested in temporarily helping to open to Rainbow City store, and when Mr. Soria indicated his interest, Mr. Smith promised to be in touch about the opportunity. (*Id.* at 7; *see also* Doc. 26-1 at 37).

The next month, Mr. Smith met with Mr. Jackson, then Gadsden's assistant team lead over merchandise, Ms. Mathews, and finally Ms. Smith. (Doc. 26-1 at 23, 25; Doc. 27 at 24; Doc. 27-18 at 8). In his conversations with Mr. Jackson and Ms. Mathews, Mr. Smith explained that opening the new store in Rainbow City would be "hard work, it's demanding, it's going to be stressful because of the higher demands and the higher expectations." (Doc. 26-1 at 24–25; *see also* Doc. 27-18 at

3

8–9; Doc. 27-23 at 5). This is because "Stores of the Future" differed from the older stores based on their layouts, shopping experience, and upgraded standards for cleanliness, neatness, and organization. (Doc. 26-1 at 17–19). Mr. Smith asked Mr. Jackson and Ms. Mathews for their "buy-in and commitment" to working at the new store. (Doc. 26-1 at 24–25). Each of them responded that they were excited and wanted to transfer to the new store. (Doc. 26-1 at 24–25).

Mr. Smith's conversation with Ms. Smith went differently. First, he informed her that he already had Mr. Jackson and Ms. Mathews' commitment to transfer to the new store, and he asked her what her plan was and whether she was going to retire. (Doc. 27 at 24, 42). Ms. Smith, who had recently filled out a self-evaluation in which she stated that she was "looking forward to extend[ing] my long ter[m] service with Big Lots in the coming year with a new team and store," (doc. 26-2 at 5–6; doc. 34-1 at 3 ¶ 8), said that her plan was in her self-evaluation (doc. 27 at 24). Mr. Smith, however, had not yet seen her self-evaluation. (Doc. 26-1 at 48; *see also* Doc. 26-2 at 8).

Ms. Smith then asked Mr. Smith about his plan for the closing of the Gadsden store and opening of the Rainbow City store. (Doc. 27 at 24, 42). He told her that the transition would be "very, very, very hard and very, very, very stressful," and that he "[couldn't] rely on taking [her] there and [her] not being able to handle that job and walk out and leave [him] hanging." (*Id.* at 23, 26, 42). Ms. Smith asked

4

what she was supposed to do, and Mr. Smith responded that he could transfer her to a different, older store as an assistant team lead. (*Id.* at 26, 42). Ms. Smith, who cares for her son and grandson (doc. 34-1 at 2–3 at ¶ 6), rejected that offer because the closest older store was forty minutes from her home and working there would interfere with her childcare responsibilities. (Doc. 27 at 71–72; Doc. 34-1 at 3 ¶ 9).

Ms. Smith asked Mr. Smith for another option, and he told her that "he could drop [her] down and give [her] a full-time position so [she] could retain the benefits at $10 an hour" at the new Rainbow City store. (Doc. 27 at 26–27). Ten dollars an hour was a significant decrease from her salary, which equated to $17.40 per hour. (*See* Doc. 27-11). Mr. Smith told her that "a lot of older associates . . . would jump at that chance because they didn't want the headache of having the full responsibility of a store." (Doc. 27 at 27). Ms. Smith told him that she did not want a demotion and asked him for any other options, and he told her that she could take the store closing pay. (*Id.* at 42). She said she did not want to do that until she talked to a human resources employee named Rick Saenz, and Mr. Smith said he would talk Mr. Saenz and "find out what [Big Lots] could do." (Doc. 27 at 27, 42). Mr. Smith never explicitly said that Ms. Smith could not transfer to the new store in her capacity as assistant team lead, but he did not offer her that position either. (Doc. 27 at 32).

A week or two later, Mr. Smith told Ms. Smith that Big Lots would offer her twelve weeks' store closing pay. (Doc. 27 at 28). At some point after that conversation, Ms. Smith spoke to Mr. Smith one more time. (*Id.* at 29). During this conversation Mr. Smith gave her some more information about the end of her employment, and she "told him that [she] really didn't want to leave the company, that [she] was sure that [she] could do a commitment to the new store," that she had worked through difficult times when other leaders had left the store but "was able to maintain the store during that time, that [she] could handle the job, moving to the stressful—the new store, that [she] would be able to handle that." (*Id.* at 29, 44). He told her that the problems at the store that Ms. Smith had dealt with "was before [him] and . . . [he was] moving ahead with [his] plan." (*Id.* at 29; *see also id.* at 39, 44).

Mr. Smith and Ms. Smith's conversations about Ms. Smith's future took place from January through mid-February 2018. (Doc. 27 at 22, 28–29). In February or March 2018, Mr. Smith asked Mr. Soria to permanently transfer to the Rainbow City store as the assistant team lead over service (the position Ms. Smith had occupied at the Gadsden store). (Doc. 27-25 at 8; *see* Doc. 26-1 at 22, 37). Ms. Mathews, the Gadsden's store's assistant team lead over merchandise, was going to continue in that role at the Rainbow City store. (Doc. 26-1 at 22–23; Doc. 27-25 at 8). But "[r]ight before the store opened," Big Lots switched Mr. Soria's and Ms. Mathews'

roles, making Mr. Soria the assistant team lead over merchandise and Ms. Mathews the assistant team lead over service. (Doc. 27-25 at 10; *see also* Doc. 27-18 at 14).

In the meantime, Ms. Smith helped to close down the Gadsden store. (Doc. 27 at 41). Her last day was April 28, 2018. (*Id.*). During those months of work, she told "[a]nybody that asked" that she was "retiring and going to sit on the beach." (Doc. 27 at 33; Doc. 27-18 at 11; Doc. 27-23 at 7–8). At her deposition, Ms. Smith testified that she made those statements because she was embarrassed about being rejected for the transfer. (Doc. 27 at 40).

## II. DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318. "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

The ADEA prohibits employers from discharging an employee who is at least 40 years of age "because of" that employee's age. 29 U.S.C. §§ 623(a)(1), 631(a). In the absence of direct evidence, courts analyze claims of age discrimination using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973). *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001) ("[W]e typically apply legal standards developed in Title VII and ADEA cases interchangeably."). Under that framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) she was a member of the protected group; (2) she was subject to an adverse employment action; (3) a substantially younger person filled the position from which she was discharged; and (4) she was qualified to do the job for which he was rejected. *Id.* at 1359.

If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to proffer legitimate, nondiscriminatory reasons for its employment decision. *Damon*, 196 F.3d at 1361. If the employer can satisfy its burden, the plaintiff must show that the employer's proffered reasons were pretext for discrimination. *Id.* To do that, the plaintiff must present evidence that the proffered reason was false and that discrimination was the real reason. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Big Lots contends that Ms. Smith cannot make out a prima facie case of discrimination because she did not suffer an adverse employment action and she was not replaced by someone substantially younger than her, but that even if she could make out a prima facie case, she cannot establish that Mr. Smith's desire for her

commitment and "buy-in" was pretextual. (Doc. 28 at 15–23). The court will address each argument separately.

1. Adverse Employment Action

Big Lots' first argument is that Ms. Smith cannot demonstrate that she suffered an adverse employment action because she voluntarily resigned. (Doc. 28 at 15–17). Specifically, it asserts that (1) Ms. Smith's belief that she could not transfer to the Rainbow City store as an assistant team lead was her own misunderstanding of Mr. Smith's offer; and (2) she cannot show that Big Lots used coercion, duress, deception, or misrepresentation to force her to resign. (*Id.* at 17). Ms. Smith responds that she was constructively discharged because Big Lots was unwilling to transfer her to the Rainbow City store while maintaining her assistant team lead position, and offered her only a demotion or transfer to a store farther away. (Doc. 35 at 25–28).

As an initial matter, the court rejects Big Lots' argument that the evidence establishes that Ms. Smith could have transferred to the Rainbow City store as an assistant team leader. (*See* Doc. 28 at 17). Although Big Lots certainly offered evidence from which a jury could make that finding, Ms. Smith countered with evidence from which a jury could reasonably find that Mr. Smith did not offer Ms. Smith that opportunity. Taken in the light most favorable to Ms. Smith, Mr. Smith told her that the Gadsden store was closing, that working as an assistant

team lead at the Rainbow City store would be very stressful, that he "[couldn't] rely on taking [her] there and [her] not being able to handle that job and walk out and leave [him] hanging," and offered either a different transfer, a demotion, or the opportunity to resign with store closing pary. (Doc. 27 at 23, 26, 42). Based on this conversation, a reasonable jury could find that Mr. Smith refused to transfer Ms. Smith to the Rainbow City store in her position as an assistant team lead.

Big Lots' next argument is that Ms. Smith cannot show that her resignation was involuntary. (Doc. 28 at 16–17). The Eleventh Circuit "recognize[s] that constructive discharge can qualify as an adverse employment decision under the ADEA." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 (11th Cir. 2001). "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in [her] position would have been compelled to resign." *Id.* at 1231 (quotation marks omitted).

Citing to *Rodriguez v. City of Doral*, 863 F.3d 1343 (11th Cir. 2017), Big Lots contends that the analysis for constructive discharge is whether it engaged in coercion, duress, deception, or misrepresentation to make Ms. Smith resign. (Doc. 28 at 16–17). The *Rodriguez* decision involved a city employee who alleged that he had been forced to resign in violation of his First Amendment right to political association. 863 F.3d at 1352–54. To determine the standard for assessing the voluntariness of a public employee's resignation in the First Amendment context,

the Eleventh Circuit turned *Hargray v. City of Hallandale*, 57 F.3d 1560, 1567–68 (11th Cir. 1995), a case in which the plaintiff, also a city employee, alleged that he had been forced to resign in violation of his Fourteenth Amendment right to due process. *See Rodriguez*, 863 F.3d at 1352–53.

Under *Hargray* and *Rodriguez*, a court determining whether a resignation is voluntary must consider whether: (1) the employer offered any alternative to resignation; (2) the employee understood her choices; (3) the employer gave the employee a reasonable time to make a choice; (4) the employee was able to select the date of resignation; and (5) the employee "had the advice of counsel." *Rodriguez*, 863 F.3d at 1352 (quoting *Hargray*, 57 F.3d at 1568). The Court in *Hargray* set out that stringent test for voluntariness because resignation is a relinquishment of the employee's property interest in her job, and without a property interest, there can be no due process violation. *See* 57 F.3d at 1567 ("If [the employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the City deprived him of it within the meaning of the due process clause.") (alterations omitted).

Neither party cites, and this court has been unable to locate, any published Eleventh Circuit cases applying *Hargray* or *Rodriguez* outside the First and Fourteenth Amendment contexts. To the contrary, before the Eleventh Circuit

issued *Hargray*, the former Fifth Circuit held, in the Title VII context, that "if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975);[1] *see also id.* (stating that constructive discharge applies in cases "in which an employee involuntarily resigns in order to escape intolerable and illegal employment requirements," such as a requirement that an atheist employee attend regular work meetings that included "a short religious talk and a prayer, both delivered by a local Baptist minister"). The Eleventh Circuit uses the same test to determine whether an employee was constructively discharged for ADEA purposes. *See Downey v. S. Nat. Gas Co.*, 649 F.2d 302, 305 (5th Cir. Unit B June 30, 1981);[2] *see also Hipp*, 252 F.3d at 1230–32.

The court finds that the "coercion, duress, deception, or misrepresentation" standard set out in *Rodriguez* and *Hargray* is not applicable in the ADEA context. Those cases, which involve public employees alleging violations of constitutional rights, are distinguishable from this case, which involves a private employee alleging

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[2] In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit held that decisions by the Unit B panel of the former Fifth Circuit are binding precedent.

12

a violation of a statutory right. The proper standard to determine whether an employee was constructively discharged is whether "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009); *Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1340–41 (11th Cir. 1999) (holding, in an ADEA case, that an employer took an adverse employment action against an employee when it informed the employee that she would have to accept a demotion or resign, even though the employee accepted neither option and instead took a fully-paid leave of absence until after the employer changed its mind); *see also Henson v. City of Dundee*, 682 F.2d 897, 907 (11th Cir. 1982) ("[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected . . . the employer has committed a constructive discharge . . . .") (quotation marks omitted).

Because Big Lots relies only on the inapplicable "coercion, duress, deception, or misrepresentation" standard, it offers no argument about whether Ms. Smith's resignation was voluntary under the standard for an adverse employment action in the ADEA context. The court declines to make that argument on Big Lots' behalf. Big Lots has not met its initial burden of showing that it is entitled to judgment as a matter of law on the question whether Ms. Smith was constructively discharged, so the court will not grant summary judgment on that basis.

## 2. Replacement by Someone Substantially Younger

Big Lots contends that Ms. Smith cannot establish an inference of age discrimination because her replacement was Mr. Soria, who is only ten years younger than her, and no other evidence suggests age discrimination. (Doc. 28 at 19–20). Ms. Smith responds that Big Lots replaced her with Ms. Mathews, who was 26 years old, but that even if Mr. Soria replaced her, she has evidence indicative of discrimination because Mr. Smith asked her about her retirement plans, told her that older associates prefer less stressful stores, and explained his refusal to transfer her as worry that she would be unable to handle the demands of the Rainbow City store. (Doc. 35 at 29–31).

Taken in the light most favorable to Ms. Smith, it appears that Big Lots hired Mr. Soria to replace Ms. Smith, but at the last minute, it switched Mr. Soria's and Ms. Mathews' roles, putting the 26-year-old Ms. Mathews in Ms. Smith's position. (Doc. 27-25 at 10; *see also* Doc. 27-18 at 14). Big Lots, relying on a view of the evidence that is more favorable to it, does not acknowledge the evidence from which a jury could find that the role-swap occurred before the Rainbow City store opened. (*See* Doc. 36 at 7–8). But even accepting Big Lots' version, there is evidence sufficient to survive summary judgment on this element of the prima facie case.

The Eleventh Circuit has explained that, on its own, a ten-year age difference is neither sufficient to establish age discrimination nor adequate to defeat a claim of

age discrimination. *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1443 (11th Cir. 1985) ("That the [plaintiff] is replaced by a person ten years younger rather than twenty years does not diminish the [age] discrimination; the subtlety only tends to disguise it.") (quotation marks omitted); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age."). The plaintiff's burden at the prima facie stage of the analysis is light. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998); *see also Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (noting that both the employee's burden at the prima facie stage and the employer's burden at the legitimate, non-discriminatory reason stage are "low bar[s] to hurdle").

Here, Ms. Smith has presented evidence that Mr. Smith opened his conversation with Ms. Smith by asking about whether she was going to retire, made a statement about older associates preferring less responsibility, and rejected Ms. Smith's February 2018 reiteration of her commitment to the job. (*See* Doc. 27 at 24, 27, 29, 42, 44). She has satisfied her light burden of presenting some evidence of discrimination in addition to the age difference. Accordingly, the court will not grant Big Lots summary judgment based on a failure to show that Ms. Smith was replaced by someone substantially younger than her.

3. Legitimate, Non-Discriminatory Reason

Ms. Smith has established a prima facie case of age discrimination. The burden therefore shifts to Big Lots to proffer legitimate, nondiscriminatory reasons for its employment decision. *Damon*, 196 F.3d at 1361. Big Lots' brief does not squarely address whether it had a legitimate, non-discriminatory reason for the employment decision. (*See generally* Doc. 28 at 14–23). However, buried in its argument on pretext, Big Lots states that Mr. Smith's "stated intention" for his conversation with Ms. Smith was to "obtain buy-in before transferring her to a more challenging work environment." (*Id.* at 21). The court assumes that this is Big Lots' legitimate, non-discriminatory reason. And indeed, Mr. Smith testified that he also requested buy-in and commitment from Mr. James and Ms. Mathews because the Rainbow City store was going to be a more demanding work environment. (Doc. 26-1 at 24–26). That is sufficient to satisfy Big Lots' burden of proffering a legitimate, non-discriminatory reason for its employment decision.

4. Pretext

Big Lots contends that Ms. Smith cannot establish that its legitimate, non-discriminatory reason is pretextual because there is no evidence that Mr. Smith was not seeking buy-in before transferring employees to the new store. (Doc. 28 at 21). Although the argument is cursory, Big Lots appears to argue that Ms. Smith cannot show that Mr. Smith lacked an honest belief that she had declined to commit to the

harder work. (*See id.*). Big Lots also argues that, even if Ms. Smith could prove that its reason was false, she cannot show that discrimination was the real reason. (*Id.* at 22–23).

To establish that an employer's proffered reason for an employment action was pretextual, the plaintiff must present evidence that the proffered reason was false and that discrimination was the real reason. *Brooks*, 446 F.3d at 1163. The question is not whether the employer's "conclusion [about the employee's work performance] is a correct one, but whether it is an honest one." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Big Lots' proffered reason for declining to transfer Ms. Smith to the Rainbow City store as an assistant team lead is that Mr. Smith was seeking her "buy-in" before transferring her. (Doc. 28 at 21). Ms. Smith has presented evidence from which a reasonable jury could find that reason to be false. Although Mr. Smith disputes Ms. Smith's recitation of their conversation, at the summary judgment stage, the court must accept Ms. Smith's version. Under her version of the facts, Mr. Smith never offered her the opportunity to transfer, and never asked for her buy-in or commitment. Instead, he told her that the job would be demanding and that he could

17

not take a risk on transferring her in her managerial position, and offered her either a demotion, a transfer to a different store that would offer less stressful work, or the opportunity to resign with store closing pay. (Doc. 27 at 23, 26–27, 42).

This case is distinguishable from cases in which the plaintiff quarrels with an employer's mistaken but honest belief that the employee performed badly or broke workplace rules. *See, e.g.*, *Alvarez*, 610 F.3d at 1266; *Rojas*, 285 F.3d at 1342. Taking the facts in the light most favorable to Ms. Smith, a jury could find that Mr. Smith lacked an honest belief that Ms. Smith was refusing to commit to the more difficult work because he never asked her to commit. That question is one a jury must decide.

Presenting evidence of the falsity of the proffered reason is not enough to survive summary judgment. Ms. Smith must also present evidence from which a jury could find that age discrimination was the real reason for Big Lots' failure to offer the transfer. *See Brooks*, 446 F.3d at 1163. Ms. Smith contends that she has carried that burden based on (1) Mr. Smith's age-based comments and (2) her theory that Mr. Smith recruited Mr. Soria and Ms. Mathews to be the Rainbow City store's assistant team leads in 2017, months before speaking to her. (Doc. 35 at 33–34).

The court notes that Ms. Smith has not presented any evidence from which a jury could find that in 2017, Mr. Smith recruited Mr. Soria and Ms. Mathews for positions as assistant team leads at the Rainbow City store. The evidence is that in

18

2017, Mr. Smith spoke with Mr. Soria about temporarily helping to open Rainbow City store, but he did not speak to Mr. Soria about permanently assuming the assistant team lead position until February or March 2018. (Doc. 27-25 at 7–8; *see* Doc. 26-1 at 22, 37). And Mr. Smith did not speak to Ms. Mathews about transferring to the Rainbow City store until January 2018. (Doc. 27 at 22).

Nevertheless, the court finds that a reasonable jury could find that age discrimination was the real reason for Big Lots' decision not to transfer Ms. Smith to the Rainbow City store as an assistant team lead. Taking Ms. Smith's evidence as true, when Mr. Smith spoke with Ms. Smith, he immediately asked her whether she was going to retire and, after she indicated a desire to continue working for Big Lots, said that "a lot of older associates . . . would jump at [a demotion to an hourly position] because they didn't want the headache of having the full responsibility of a store." (Doc. 27 at 24, 27, 42).

Big Lots points to Ms. Smith's repeated statements to coworkers and customers that she was "retiring to go sit on a beach" as evidence that defeats any claim of pretext. (Doc. 28 at 22). Even assuming Ms. Smith's comments about her resignation are relevant to Big Lots' reason for declining to transfer her, those comments implicate her credibility, which is a question of fact for a jury, not the court, to decide. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir.

2010).  The court will not grant Big Lots summary judgment on the ground that Ms. Smith has failed to present evidence of pretext.

### III. CONCLUSION

The court **DENIES** Big Lots' motion for summary judgment.

**DONE** and **ORDERED** this June 28, 2021.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE